**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 98-60336

AETNA CASUALTY & SURETY COMPANY,

Plaintiff-Appellant,

VERSUS

PENDLETON DETECTIVES OF MISSISSIPPI, INC.

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Mississippi

August 9, 1999

Before GARWOOD, DUHÉ, and BENAVIDES, Circuit Judges,

JOHN M. DUHÉ, JR., Circuit Judge:

Aetna Casualty & Surety Company ("Aetna") sued Pendleton Detectives of Mississippi, Inc. ("Pendleton") for recovery of the amount of claims it paid for losses to its insured, The Merchants Company, Inc. ("Merchants"), resulting from Pendleton's negligence or breach of contract. The jury awarded Aetna $174,000 in damages. Subsequently, the district court granted Pendleton's Motion for Judgement as a Matter of Law and entered judgment for Pendleton. Aetna appeals arguing the district court erred, because Aetna presented sufficient evidence to sustain the jury's verdict. We agree, and reverse the district court's judgment and reinstate the jury's verdict.

**BACKGROUND**

In August 1993, Pendleton contracted with Merchants to provide

security for Merchants' Jackson, Mississippi distribution warehouse facility. Merchants quickly determined that it was unsatisfied with Pendleton's service. Merchants complained that the gate was left open at times, guards arrived at work intoxicated, made personal phone calls, and entertained members of the opposite sex while on duty. In early 1995, Merchants determined through its inventories an unusually high amount of loss from its warehouse. Merchants suspected night shift employee theft was responsible for the increased losses. Merchants fired its night shift manager and notified Pendleton, but the problem only grew worse. After Merchants notified Pendleton again of the problem, it hired a private investigator posing as an employee to investigate the problem. The private investigator concluded employee theft was responsible for the losses. Additionally, several night shift employees, while taking lie detector tests administered by a hired expert, admitted stealing large amounts of food from the warehouse. After receiving Merchants' complaints, Robert H. Pendleton, chairman of the board of Pendleton, sent Merchants a memo acknowledging that the guards' performance was below what was expected.

On January 31, 1996, Merchants submitted a claim of $430,266.68 for losses resulting from theft at its Jackson, Mississippi warehouse. After settling the claim, Aetna sued to recover the amount as Merchants' legal subrogee and contractual assignee. Although the jury awarded $174,000 in damages to Aetna, the district court granted Pendleton's Motion for Judgment as a

Matter of Law and entered a judgment for Pendleton on May 8, 1998. Merchants appeals.

## DISCUSSION

We review the district court's grant of a motion for judgment as a matter of law de novo, applying the same standard it used. See Hill v. International Paper Co., 121 F.3d 168, 170 (5th Cir. 1997). A court may grant a judgment as a matter of law if after a party has been fully heard by the jury on an issue, "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." Fed. R. Civ. P. 50; Conkling v. Turner, 18 F.3d 1285, 1300 (5th Cir. 1994). A court should view the entire record in the light most favorable to the non-movant, drawing all factual inferences in favor of the non-moving party, and "leaving credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts to the jury." Conkling, 18 F.3d at 1300 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

The district court based its ruling on Merchants' failure to introduce conclusive evidence that the thefts occurred while Pendleton guards were on duty. Although Pendleton's security expert, Robert Vause, testified that it was more likely than not that the theft occurred because of Pendleton's substandard service, the district court disregarded his testimony because his belief was based on the lax security environment created by Pendleton employees at Merchants' warehouse.

Merchants contends that it presented sufficient evidence to

3

support the jury's verdict, while Pendleton asserts that Merchants did not prove its employees proximately caused Merchants' losses. Specifically, Pendleton argues Merchants failed to present direct evidence that Pendleton guards were on duty when the thefts occurred. While admitting that its security services were sub-standard, Pendleton contends that Merchants' restrictions on its security service caused the losses rather than Pendleton's sub-standard services.

To prove negligence, "a plaintiff must prove by a preponderance of the evidence each element of negligence: duty, breach of duty, proximate causation, and injury." Lovett v. Bradford, 676 So.2d 893, 896 (Miss. 1996). Circumstantial evidence is sufficient to prove proximate cause under Mississippi law. See K-Mart, Corp. v. Hardy, No. 97-CA-01223-SCT, 1999 WL 145306, at *5 (Miss. March 18, 1999). "'[N]egligence may be established by circumstantial evidence in the absence of testimony by eyewitnesses provided the circumstances are such as to take the case out of the realm of conjecture and place it within the field of legitimate inference.'" Id. (quoting Downs v. Choo, 656 So.2d 84, 90 (Miss. 1995)); see Davis v. Flippen, 260 So.2d 847, 848 (Miss. 1972) ("when the case turns on circumstantial evidence it should rarely be taken from the jury.").

Merchants presented the following evidence of Pendleton's negligent security practices: (1) guards slept on the job; (2) guards watched T.V. on the job; (3) guards drank on the job; (4) guards entertained guests of the opposite sex on the job; (5)

4

guards left the gate to the warehouse open; (6) Pendleton's admission of failing to perform sufficient background checks on its guards; (7) the private investigator's conclusion that night shift employees were responsible for the losses; (8) several of Merchants' night shift employees' confessions to stealing large amounts of food; (9) Pendleton's contractual obligation to provide security from 4 p.m. to 8 a.m. and 24 hours a day on weekends; (10) Merchants' repeated reports of suspected employee theft to Pendleton; (11) the report of a person wearing a Pendleton baseball cap selling Merchants' products from the trunk of his car; and (12) Merchants' security expert's testimony that it was more probable than not that Pendleton's lax security practices caused the losses. Merchants argues the above evidence is sufficient to support the jury's verdict.

Pendleton argues that Merchants' restrictions on its security service caused the losses, and that, because of the limited nature of the security service Merchants requested, the loss would have occurred even had Pendleton performed its duties perfectly. Pendleton contends the following restrictions placed upon its service by Merchants prevented it from deterring the losses: (1) Pendleton was not allowed to go inside Merchants' warehouse; (2) Pendleton was not allowed to inspect the inside of trucks or employee vehicles leaving the facility; (3) Pendleton did not provide 24 hour a day protection 7 days a week; and (4) the Pendleton security officer's view of the employee parking lot was obstructed for a short period of time every hour while he conducted

5

rounds of the premises.

At trial, Pendleton theorized that Merchant's former night shipping manager was involved in a large scale scheme to steal food by colluding with truck drivers to falsify shipping documents and send sealed trucks full of food to non-existent locations. Pendleton contended that because its guards lacked the authority to search sealed trucks as they left the gates of Merchants' facility, it was unable to prevent the losses Merchants suffered. However, Pendleton did not offer evidence that Merchants accused its truck drivers of stealing or that it ever suspected or investigated any occurrences of falsified shipping documents. Moreover, Merchants' evidence established that the substantial losses from theft continued long after Merchants fired the night shipping manager.

Merchants' evidence at trial sufficiently supports the jury's inference of causation between Pendleton's lax security practices and the losses Merchants suffered. The Security Instructions developed by Pendleton exclusively for Merchants expressly stated that the mission of Pendleton's post was "to maintain security of the property and prevent fires, theft, etc. during all hours." The Security Instructions required that Merchants' employees enter the facility only through a gate located next to the guard house and that Pendleton guards be stationed at the guard house during their entire shift except during the brief period of their rounds. These instructions also authorized Pendleton's guards to stop Merchants' employees and inspect any packages or bundles they were carrying, and mandated that Pendleton guards keep a "close check on the

6

employee parking area to deter outsiders, or *other employees*, from tampering with or damaging employee vehicles." (emphasis added). Additionally, while the guards' view of the employee parking lot was obstructed for a short period of time every hour during the rounds of the premises, the guards were to perform these rounds randomly rather than at a set time of day and were supposed to lock the gate while away, requiring employees to wait until the guard's return to exit the facility, thereby reducing the likelihood of employee theft during this brief absence.

The period of loss claimed by Merchants extended from October 1994 to December 1995. During this period Merchants employed up to 90 night shift employees, and Pendleton was required to conduct nearly 1000 shifts of security services. The jury's award of $174,000 to Aetna, an amount substantially smaller than the $430,266.68 Aetna demanded, evidences the jury's implicit conclusion that Pendleton caused at least some of Merchants' losses. The jury obviously concluded that while the night shipping manager Merchants fired in July 1995 caused some of the losses, Pendleton's sub-standard security practices also caused $174,000 of the losses Merchants suffered.

Based on the above evidence, a reasonable juror could not only have concluded that Pendleton's poor security practices allowed Merchants' night shift employees to steal with impunity, but that in fact Pendleton's security officers were also involved in the theft from Merchants themselves. For the above reasons, we reverse the district court's decision and reinstate the jury's verdict.

**REVERSED and jury verdict REINSTATED**